# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| William H. Renz, | : | Case No. 1:04CV0426 |
| | : | |
| Plaintiff | : | |
| | : | Magistrate Judge David S. Perelman |
| v. | : | |
| | : | |
| PJAX, Inc., | : | **MEMORANDUM OPINION** |
| | : | **AND ORDER** |
| Defendant | : | |

This action, now before the court upon the motion for summary judgment of defendant PJAX, Inc. ("PJAX"),[1] was brought by the plaintiff, William H. Renz, alleging that PJAX, his employer, committed an intentional tort against him.[2]

Plaintiff was employed as a truck driver for PJAX, which is in the delivery business.  On the date of his accident, June 12, 2003, the plaintiff was assigned to haul merchandise to various customers in Northeast Ohio, and his claim arises from injuries sustained while making a delivery at the St. Joseph's Care Center in Lewisville, Ohio.

While making deliveries two days earlier the plaintiff became aware that the lift gate on the back

---

[1] The recitation of facts set out hereinafter is primarily taken from the plaintiff's complaint and his deposition testimony.

[2] The action was filed in the Cuyahoga County Common Pleas Court, and removed to this federal court based upon diversity of citizenship.

of the truck he was driving had become inoperable.[3]  That lift gate was ordinarily used to move merchandise from the truck to the ground in locations where the customers did not have a loading dock.

On June 10th PJAX maintenance personnel removed the lift gate motor, thereby temporarily disabling the lift gate, in order to complete repairs on the motor.  The lift gate was then raised to the uppermost position and chained in that position so that it would not fall down and drag behind the truck.

Also problematic was the rear door of that truck, which at times would not remain closed and at other times would stick.

Plaintiff testified during his deposition that on a typical day "the truck would be packed as high as it could be packed to get the door shut."  He stated that on such a day he would "turn around, go back to the office, tell them the truck should not be loaded like [th]at[,]" after which he would be told that if he wanted to work he should go make the deliveries.  In addition, merchandise loaded into the truck was not always shrink-wrapped on a pallet, so that many times loose boxes would be stacked on top of each other.  While load locks and safety straps could be used to secure loads from shifting, plaintiff claimed that these devices were not available when he requested them.  He testified that he specifically stated to his employer that the manner of loading the trucks was dangerous.

On June 11, 2003 plaintiff made his round of deliveries, apparently without incident with either the gate or the door.

On June 12, 2003, plaintiff was again assigned to drive the truck with the broken lift gate (chained in the upright position) and the door which would stick shut or would not latch.  He testified that the truck

_____

[3]The plaintiff completed "Driver's Vehicle Inspection Reports" dated June 10, 11 and 12, 2003 pertaining to the malfunctioning lift gate.

2

was overloaded with merchandise, including large spools of wire, cases of "Ensure" nutritional supplements, and adult diapers referred to as "Depends."  The hard cases of "Ensure" were apparently loaded on top of the soft packages of "Depends," which he believed made them unsteady.  He stated that after his first stop, where he unloaded the wire spools with the help of a forklift, he attempted to readjust the load so that it would be more stable.

Plaintiff's second stop was at St. Joseph's Care Center, where he was to deliver the "Ensure" and "Depends."  When he arrived, he went inside to obtain a wheeled cart to assist him in moving the load of merchandise.  Plaintiff attempted to open the door of the truck while standing on the ground and reaching up, but it was stuck.  He then climbed up onto the back end of the truck, which had a ledge approximately eleven inches wide, and  with both hands  pulled up on the door handle.  The door rose, but when it got past the cases of "Ensure" the load fell towards him shoving him backwards, his foot caught on the chain used to secure the lift gate, and he fell  to the ground striking his head on the wheeled cart and suffering serious injuries.

In seeking summary judgment defendant argues that, accepting as true for the purposes of the instant motion, the plaintiff's allegations regarding the defective door and liftgate, the improper loading of the truck, and the unavailability of load locks or straps to secure the load, there is no genuine issue of material fact pertaining to the elements of intentional tort and, therefore, it is entitled to judgment as a matter of law.

The disposition of a motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides for the granting of such motion only where, "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

3

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." It is the court's function under such a motion to determine whether a genuine issue of material fact

exists, as opposed to endeavoring to resolve any such factual issues. Tee-Pak, Inc. v. St. Regis Paper Co.,

491 F.2d 1193 (6th Cir. 1974); 6 Moore's Federal Practice 56.15 [1.-0].

It is the initial burden of the moving party to demonstrate the absence of a genuine issue

of material fact as to an essential element of the claims brought by the non-moving party. Cuarto v. Harper

Woods, 954 F.2d 1237, 1241 (6th Cir. 1992); Wilson v. Zanesville, 954 F.2d 349, 350-351 (6th Cir.

1992); Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989).

In Street v. J.C. Bradford & Co., supra, the Sixth Circuit Court of Appeals reviewed three then

recent decisions of the United States Supreme Court addressing summary judgment practice, Anderson

v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); and

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).[4]  The court summarized

those cases as standing for a number of new principles in summary judgment practice, including the fact that

cases involving considerations of state of mind issues (such as discriminatory action) are not automatically

inappropriate for summary judgment; that a federal directed verdict standard ("whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law") should be applied to summary judgment motions; that a non-moving

party must provide "more than a mere scintilla of evidence" to avoid summary judgment;  that the

substantive law applicable to the cause of action will govern the materiality of the issues of fact; that the

---

[4]After the passage of a number of years the court's reference to those rulings as representing a "new era" of "dramatic change" may no longer hold true, but the characterization of their import as to motions for summary judgment being viewed with "more favorable regard" certainly remains true.

court has no duty to search the record to determine the existence of genuine issues of material fact; and perhaps most significant, that a trial court has more discretion than it would have in the past in weighing the evidence offered by the non-moving party, considered in light of the whole record, to determine whether that party's evidence does "more than simply show that there is some metaphysical doubt as to the material facts" or whether it demonstrates that the non-moving party's claims are "implausible". Id. at 1479-1480 (Footnotes and citations omitted.)

Under the law of Ohio, which applies in this diversity action, workers' compensation law is controlling in litigation over workplace injuries. See, Ohio Revised Code §4123.74. An employee injured on the job in Ohio may not sue his or her employer unless the employer engaged in conduct amounting to an intentional tort. See, Ohio Revised Code §§4123.74 and 2745.01; Blankenship v. Cincinnati Milacron Chemicals, Inc., 69 Ohio St.2d 608, 433 N.E.2d 572, cert. denied, 459 U.S. 857 (1982).

In order to establish a claim of intentional tort under Ohio law, a plaintiff must prove the following elements:

> (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances and with such knowledge, did act to require the employee to continue to perform the dangerous task.

Fyffe v. Jeno's, Inc., 59 Ohio St.3d 115, 118, 570 N.E.2d 1108 (1991). In Fyffe the Ohio Supreme Court made explicit that the controlling standard is:

> To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some

5

risk, his conduct may be negligence.  As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness.  If the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result.  *However, the mere knowledge and appreciation of a risk--something short of substantial certainty–is not intent.*

Ibid, (Emphasis added.)

Broad interpretation of intentional tort would undermine the rationale of the Workers' Compensation Act:

"If 'intentional wrong' is interpreted too broadly, this single exception would swallow up the entire 'exclusivity' provision of the Act, since virtually all employee accidents, injuries, and sicknesses are a result of the employer or a co-employee intentionally acting to do whatever it is that may or may not lead to eventual injury or disease.  Thus in setting an appropriate standard by which to measure an 'intentional wrong,' we are careful to keep an eye fixed on the obvious: the system of workers' compensation confronts head-on the unpleasant, even harsh, reality--but a reality nevertheless--that industry knowingly exposes workers to the risks of injury and disease."

Van Fossen v. Babcock & Wilcox Co., 36 Ohio St. 3d 100, 115-16, 522 N.E.2d 489, 503 (1988)

(quoting Millison v. E.I.du Pont de Nemours & Co., 101 N.J. 161, 177, 501 A.2d 505, 513 (1985)).

An intentional tort is not demonstrated merely by showing proven safety violations on behalf of the employer:

There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved.  Such conduct may be characterized as gross negligence or wantonness on the part of the employer.  However, in view of the overall purposes of our Workers' Compensation Act, such

conduct should not be classified as an 'intentional tort.'

Van Fossen v. Babcock & Wilcox Co., supra at 117.

In order to satisfy the first element of the Fyffe test, a plaintiff must establish the existence of a dangerous process. "Dangerous work must be distinguished from an otherwise dangerous condition within that work. It is the latter of which that must be within the knowledge of the employer before liability could attach." Dailey v. Eaton Corp., 138 Ohio App.3d 575, 582, 741 N.E.2d 946 (Ct. App. Marion County 2000), quoting Naragon v. Dayton Power & Light Co., unreported, Case No. 17-97-221, 1998 Ohio App. LEXIS 1531 (Ct. App. Shelby County 1998). The mere fact that a possibility of injury from a workplace danger becomes a reality, does not necessarily satisfy the first Fyffe element. Wallace v. Shelly and Sands, supra at **14.

Most intentional tort cases turn on whether there is a genuine issue of material fact as to the second prong of the Fyffe test regarding the employer's awareness of a substantial certainty of harm to which the plaintiff was subjected by reason of the work alleged to have been performed when the employee was injured. Taulbee v. Adience, 120 Ohio App.3d 11, 17, 696 N.E.2d 625 (Ct. App. Franklin County 1997). Not even a "plethora of negligence" rises to the level of a substantial certainty. Wehri v. Countrymark, Inc., 82 Ohio App.3d 535, 612 N.E.2d 791, 793 (Ct. App. Allen County 1992). It is also not sufficient to show "what a reasonable person should have known," Burkey v. Teledyne Engineering, unreported, Case No. AP030015, 2000 Ohio App. LEXIS 3121 (Ct. App. Tuscarawas County 2000), but instead it must be shown that an employer had "actual knowledge" of the consequences of the exact dangers which ultimately resulted in the injury to plaintiff. Wallace v. Shelly and Sands, supra at **11, citing Sanek v. Duracote, 43 Ohio St.3d 169, 172, 539 N.E.2d 1114 (1989).

7

While evidence of prior accidents is probative in determining whether an employer knew that an injury was substantially certain to occur, the "absence of prior accidents 'strongly suggests' that injury from the procedure was not substantially certain to result from the manner in which the job was performed." Taulbee v. Adience, supra at 20.

"Even if an injury is foreseeable, and even if it is probable that the injury would occur if one were exposed to the danger enough times, 'there is a difference between probability and substantial certainty.'" Heard v. United States Parcel Service, unreported, Case No. 98AP-1267, 1999 Ohio App. LEXIS 3360 (Ct. App. Franklin County 1999), appeal not allowed, 87 Ohio St.3d 1450, 719 N.E.2d 966 (1999).  In the foregoing case, where a plaintiff offered evidence of prior accidents to show that an employer was aware of a pattern of injuries from "a facility-wide hazard," the court held that the second prong of Fyffe was not met as plaintiff had only offered evidence of the potential for harm or the probability of harm, but not the substantial certainty of harm.  Id. at *13 and *14. Evidence of prior injury reports were indicative of negligence or even recklessness on behalf of the employer, but nonetheless failed to create a genuine issue of material fact with regard to whether the employer knew to a substantial certainty that the plaintiff would be injured by the hazard.  Id. at *16.

In a similar vein, evidence of failure to take corrective measures detailed in an accident report prepared by the Ohio Bureau of Workers' Compensation Safety Violations Investigation Unit "sound[ed] of negligence or recklessness but not intentional conduct." Anguiano v. Honeywell, unreported, Case No. 1634, 2004 Ohio App. LEXIS 5205, **17 (Ct. App. Darke County 2004), quoting Tipton v Bernie's Elec. Sales & Sevs., unreported, Case No. WM-02-009, 2003 Ohio App. LEXIS 1577 (Ct. App. Williams County 2003).

Even where an expert opines that to a reasonable degree of certainty an injury was substantially certain to occur, that maybe sufficient evidence of employer negligence but not sufficient evidence to satisfy the second Fyffe element.  See, Scrivner v. Ohio Department of Rehabilitation and Correction, unreported, Case No. 04AP-352, 2005 Ohio App. LEXIS 1747, **10-11 (Ct. App. Franklin County 2005); Sloan v. Capitol Manufacturing Co., unreported, Case No. 2004-04-009, 2005 Ohio App. LEXIS 283, **5 (Ct. App. Madison County 2005).

Demonstrating the difficult burden facing an employee alleging an intentional tort are the following cases in which summary judgment was granted on behalf of an employer by reason of the employee's failure to create a genuine issue of material fact with regard to the second Fyffe factor.

An employee was injured when a faulty roof vent caused an explosion.  The employer knew about the faulty vent and the potential for hydrogen gas build-up/explosion, and yet despite the fact that there was no warning system for employees working nearby to be alerted to such a build-up of hydrogen gas, an Ohio appellate court held that the plaintiff had only offered evidence of a "significant risk of an explosion" but not that it was a substantial certainty.  Goodwin v. Karlshamns U.S.A., Inc., 85 Ohio App.3d 240, 246, 619 N.E.2d 508 (Ct. App. Franklin County 1993).

In Beard v. Coleman Trucking, Inc., unreported, Case No. 69232, 1995 Ohio App. LEXIS 5517 (Ct. App. Cuyahoga County 1995), the appellate court affirmed summary judgment granted on behalf of an employer, holding that there was no evidence that injury to the plaintiff/employee was substantially certain to occur where the employee suffered carbon monoxide poisoning from the use of a gas-operated generator in an enclosed building, but none of his co-workers complained of ill-effects.  The court stated that the employer's mere knowledge and appreciation of a risk could not amount to substantial certainty.

9

Id. at *7 and *8.

In another Ohio case, the court upheld summary judgment on behalf of an employer who had violated administrative safety regulations by failing to train employees as to safe practices in constructing scaffolding, by use of scaffolding in violation of state base to height ratios, by failing to provide safety belts, and by erecting scaffolding towers in contravention of directions provided by the manufacturer, finding that despite the foregoing shortcomings there was no evidence that the employer knew with a substantial certainty that the plaintiff/employee would be injured.  Shannon v. Waco Scaffolding & Equipment, unreported, Case Nos. 67406 and 67604, 1995 Ohio App. LEXIS 3120, at *33-*35 (Ct. App. Cuyahoga County 1995).

Even when an employer stipulated that there was a potential for the plaintiff/employee to fall while performing her maintenance work on furnaces in a plant the court affirmed summary judgment to the employer, finding that although the plaintiffs had offered evidence of knowledge and appreciation of a risk of injury that showing fell short of substantial certainty.  Nolan v. Ormet Corp., unreported, Case No. 790, 1997 Ohio App. LEXIS 4061 (Ct. App. Monroe County 1997).

The Sixth Circuit Court of Appeals upheld summary judgment in a case in which an employee was burned by a flash fire caused by ignition of butane gas vapors emitted in an oil refinery.  Rodriguez v. Sun Company, Inc., unreported, Case No. 95-3869, 1996 U.S. App. LEXIS 27237 (6th Cir. 1996).  Although there had been a number of prior releases of butane gas in the refinery none of the previous emissions had resulted in an ignition, a fact which was deemed probative, but not dispositive.  Id. at *10.  The court held that while the plaintiffs had offered evidence that a fire was a strong possibility there was no evidence that a fire was a substantial certainty,  and, therefore, no evidence that injury to plaintiff was substantially certain

10

to occur. Id. at *10-*11.

In another case the Sixth Circuit affirmed the dismissal of a case brought against a power plant by the estate of an employee who was alleged to have been exposed to carcinogenic substances present in her work environment. Debevec v. General Electric Company, unreported, Case No. 96-3465, 1997 U.S.App. LEXIS 21630 (6th Cir. 1997). The court held that even though scientific information that put the employer on notice that its failure to monitor radiation and thorium, failure to post warnings regarding radiation, failure to perform radiation checks on employees and failure to test air quality showed "less than due regard for the potential dangers such substances pose," evidence of those actions, standing alone, without evidence that some harmful substance was in fact released, could not amount to knowledge of a substantial certainty that plaintiff would be injured and did not constitute an intentional tort. Id. at *9.

Turning to the present case, in order to satisfy the second prong of the Fyffe test plaintiff had to produce evidence that PJAX knew of the substantial certainty of injury to him as a consequence of the enumerated dangerous conditions, i.e., the broken lift gate and sticking door, the overloading of the truck, and the unavailability of load locks or straps.

Having reviewed the evidence of record in this case, including the affidavit and report of plaintiff's expert witness Mr. Richard E. Harkness, this Court fails to find sufficient evidence to satisfy the second Fyffe element.

As regards the sticking door, there is no evidence in the record showing that the injury to plaintiff was caused by the sticking door. Rather, plaintiff testified upon deposition that the door stuck because the load had shifted. In addition, there was no testimony indicating that he had informed his employer that the sticking door posed a threat to his safety. In fact, he stated that the problem had been ongoing, and offered

11

nothing to show that there had been any injuries to him or any other employee as a result of the truck's sticking door.

Similarly, the broken lift gate itself has not been shown to have caused plaintiff's injury.  Plaintiff testified that the purpose of the lift gate was to move loads of merchandise from the truck to the ground and vice versa,  and did not testify that the lift gate was to be used to catch falling truck drivers.  The lift gate had been broken for several days and the deliveries were made without incident.  As for his employer's awareness, if any, that the broken lift gate posed a danger to him, plaintiff stated that various employees should have known of the danger to him from "obstructing [his] easement" with a chain to hold up the lift gate simply because had they been in the trucking business for "any amount of time" it would be "a matter of common sense."  He was unable to provide any evidence of company rules or any governmental agency rules or regulations regarding the dangers of chaining up a truck's lift gate.

With regard to the practice of overloading the trucks, plaintiff testified upon deposition that on several occasions, including the day at issue herein, he went to the PJAX office and informed office personnel that "this load is going to fall.  It's not safe." He described the conversation as follows:

> "Take the load." Same as always.  "Do you want to work today or don't you?" "We don't have any other truck" or something like that.  Not, "We don't have any other truck." "We don't have any other work for you. Go home.  Other than that truck."

When asked whether he had ever been knocked off the back of a PJAX truck as a result of a load from his truck falling on him, plaintiff responded affirmatively and then added:

> God, I don't know.  I can't remember specific dates.  I didn't get injured. I got out of the way.  It's a daily thing.  It's like a bull fighter.  It's coming. Just jump back and land on your feet and you're okay.  When you get to the lift gate and the lift gate works, you've got plenty of room, buddy.

> You've got plenty of room to get out of the way.  Without the lift gate
> you're on an island.

Notably, plaintiff did not testify that he had informed his employer of these instances.  Rather, the following exchange reflects how it was he claimed his employer should have foreseen the fact that he would get injured as a result of the practice of overloading:

> Q: So basically the only reason they should have foreseen this was because you told them and because of their experience in the trucking industry?
>
> MR. SANSON: Objection.
>
> THE WITNESS: Yes.  I don't know.  I guess.  Yeah.
> My opinion?  Yeah.  I mean, it's common sense.

The evidence offered by the plaintiff regarding the practice of overloading his truck at most demonstrates that his employer had an awareness that there could be a problem with engaging in that practice, which might have amounted to negligence or even reckless conduct, but, in this Court's opinion, there is nothing indicating his employer's knowledge with substantial certainty that plaintiff would sustain injuries in the manner in which he did.  This Court believes that this conclusion is consistent with, if not compelled by,  the Ohio authorities considered herein in which courts found there to have been no intentional tort committed by the employer.  Indeed, this Court considers that in most of those instances there had been more flagrantly reckless conduct by the employers in the face of their employees' exposure to dangerous conditions.

This conclusion has been reached with consideration of the opinion of plaintiff's expert,  Mr. Richard Harkness, that an intentional tort had been committed, which appears to primarily rest upon plaintiff's own self-serving statements regarding the practice of overloading as well as those of other

13

personnel who also stated that there had been "double-stack[ing] of pallet loads," that it was company practice to "load a truck to its maximum capacity to make the maximum use of the truck," and that "freight should not be allowed to shift."   This Court finds nothing more in the Harkness report supporting reaching the conclusion that PJAX knew with a substantial certainty that the plaintiff would be injured in the manner in which he was.[5]

Having found that defendant has demonstrated an absence of a genuine issue of material fact as to the second Fyffe element, defendant's motion for summary judgment will be granted.



s/DAVID S. PERELMAN
United States Magistrate Judge


DATE:   May 16, 2005

---

[5]Having so found, defendant's motion to strike the affidavit and report of Mr. Harkness and/or motion for reconsideration of this Court's decision to grant the plaintiff's motion for leave to supplement the plaintiff's memorandum and appendix is moot.

14